FILED ENTERED
LOGGED RECEIVED

MAY 24 2017

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME(s) TERRELL ALLEN (terrell.allen.3382) THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 17-1340-ADC |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Reid T. Messner, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain Facebook usernames that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the usernames.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms and Explosives (ATF) and have been since September 2014. Prior to joining the ATF, I was a Special Agent and Police Officer with the United States Capitol Police for five year. I have a Bachelor's of Science Degree in Fire, Safety, Engineering Technology and an Associates of Arts Degree in Police Studies from Eastern Kentucky University. I am also a graduate of the Uniform Police Training Program (UPTP) and the Criminal Investigator Training Program (CITP) from the

Federal Law Enforcement Training Center (FLETC) in Glynco GA. In addition, I am a graduate of the ATF Special Agent Basic Training Program (SABT). Both the CITP and SABT training programs covered various topics and training pertaining to internet and other electronic technical matters used during criminal investigations.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents/law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. This is an Affidavit in support of an application for a search warrant for information associated with the following social media account:

- Username: Terrell Allen (terrell.allen.3382), believed to be used by Terrell ALLEN **(Target Account)**

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of (a) distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); and (b) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (collectively the SUBJECT OFFENSES) have occurred. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

**A. CASE BACKGROUND**

6. In the summer of 2016, ATF began an investigation into a drug trafficking organization (DTO) selling heroin, cocaine and crack cocaine from open-air drug "shops" in Baltimore City, including one located in the Latrobe Homes public housing complex. Based on evidence gathered to date from confidential sources of information, a covert video camera,

controlled purchases of narcotics and interception of wire and electronic communications of several of the **TARGET SUBJECTS,** I believe that this organization is led by Terrell ALLEN (hereinafter the ALLEN DTO).

7. On February 21, 2017, federal arrest warrants were issued for **TARGET SUBJECTS** for violation of (a) distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); and (b) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846. Consequently, law enforcement personnel took the TARGET SUBJECTS into custody on or around that date.

**B. ELECTRONIC SURVEILLANCE OF THE TARGET SUBJECTS**

8. Pursuant to this investigation, in the months of November and December 2016, investigators began conducting electronic surveillance (i.e. wiretapping) of a telephone used by four DTO members. Interception of these telephones allowed investigators to identify other suspected DTO members to include ALLEN, a senior member of the DTO. In January 2017, investigators began intercepting a telephone used by ALLEN (TARGET TELEPHONE 5). As a result of the interception of ALLEN's telephone, investigators were able to identify possible sources of supply of narcotics to the DTO and locations believed to be where the DTO is storing narcotics.[1]

9. Over the course of the period of interception, investigators have intercepted hundreds of calls between ALLEN and other suspected DTO members in which they discussed or arranged for the distribution of suspected narcotics.

E. **INTERCEPTED CALLS INVOLVING ALLEN**

[1] The interception of the TARGET TELEPHONES was authorized by the Honorable George L. Russell III, of the United States District Court for the District of Maryland between November 2016 and February 2017.

10. Based on evidence gathered to date, I believe that ALLEN is the leader of the DTO who obtains wholesale quantities of narcotics from various sources of supply (including from an individual known as "BLUE") and then distributes those narcotics to other members of the DTO for sale. On January 11, 2017, Judge Russell authorized interception of a phone used by ALLEN (TARGET TELEPHONE 5). During the period of interception, investigators have intercepted numerous calls/text messages related to narcotic sales and distribution with other suspected DTO members to include, but not limited to Lawrence TROGDON, a senior member of the DTO who was found to be coordinating the activities of lower-level members of the organization (like WEAVER). The following calls are not exhaustive, but merely exemplify the probable cause of ALLEN's participation in the drug trafficking conspiracy.

11. On December 23, 2016, investigators intercepted a call from TROGDON on TARGET TELEPHONE 3 to ALLEN on TARGET TELEPHONE 5. Below is an excerpt of the conversation.

ALLEN: You feel me. You know [U/I]. Basically, out of the pound for a while, a couple days.

TROGDON: We got go [U/I]. I done sold uh, twenty five hundred. [U/I], Wacky and Rell driving around [U/I] the truck.

ALLEN: Yeah, I'm talking bout, RELL on some…that…that… mother fuckin Magic Johnson [U/I]

TROGDON: Hmm.

ALLEN: Relly on the J ride, hopefully back on some ole Rich Porter satus, so better than ever.

*Later in the call*

ALLEN: Umhm. Other than that, man I aint, you know, doing nothing [U/I], came to holla at me to [U/I] him some old math that uh, Moo Moo had but Moo Moo told me to give it to him. I gave it to him. [U/I] math, other than that I'm coolin.

TROGDON: Uh

ALLEN: Some old math, that Moo Moo musta owed him. I was hollering at Moo Moo until Moo Moo told me to give the math to him. I gave some of the math I had a few little [[PH]] pieces of math for em. Other than that, man I was just coolin. [U/I] I was gonna go holla at you all, when I get to the office and get this Moo Moo from this motherfucker already [U/I], break off a whole one, know what I'm saying. Other than that I was I was basically buy one of them bitches out the office. I was already waitin [PH] anyway.

TROGDON: Umhm.

12. Based on my training, knowledge, experience and knowledge of the case, I believe that in this call when TROGDON told ALLEN, "I done sold uh, twenty-five hundred. [U/I], Wacky and Rell driving around [U/I] the truck," that TROGDON was referring to the fact that he recently sold $2500 worth of narcotics and that Deangelo ROUZER ("Wacky) and WEAVER ("Rell") were using TROGDON's truck to distribute narcotics.

13. Later in the call I believe, based on my training, knowledge and expertise, that ALLEN told TROGDON that he had provided narcotics to "MOO MOO" ("I gave some of the math I had a few little [[PH]] pieces of math for em."). ALLEN further explained to TROGDON that he (ALLEN) would soon provide a larger quantity of narcotics ("when I get to the office and get this moo moo from this motherfucker already [U/I], break off a whole one"). Based on my training, knowledge, and experience, I know that the term "whole one" is commonly used by drug traffickers to refer to an ounce.

14. On January 16, 2017, investigators intercepted a telephone call on TARGET TELEPHONE 3 and TARGET TELEPHONE 5 between ALLEN and TROGDON. Below is an excerpt of the conversation.

ALLEN: You knock somebody out too?

TROGDON: Yeah, I cracked a nigga.

ALLEN: For what? The whole time I was with [U/I], the whole time the other night, you know what I'm saying? We aint have to, you know what I'm sayin?

TROGDON: Oh, yeah?

ALLEN: I said, "Oh my God." These fuckers tried to run in the house. You heard me?

TROGDON: Oh yeah?

ALLEN: There aint no need to man. I'm gonna knock on your door, both ways. Left and right, you heard me? They say, "Please!" [chuckles] You know.

TROGDON: Shit, them niggas up there playin' with FN's and shit.

ALLEN: Huh?

TROGDON: Nigga said them niggas playin' with [U/I], some, some army shit, man. We gotta get different type shit.

15. Based on my training, knowledge and expertise as well as my knowledge of the case, and my review of the evidence in this case, I believe that the DTO has been involved in a dispute with a rival DTO in East Baltimore that has resulted in several shootings. I believe that in

this conversation, TROGDON told ALLEN that the rival DTO had powerful firearms ("them niggas playin' with [U/I], some, some army shit") and that he and TROGDON needed to find better weapons ("We gotta get different type shit.").

16. On January 17, 2017, investigators intercepted a telephone call between ALLEN and an unknown male. The following is an excerpt from that call.

| | |
|---|---|
| U/M: | Hello- hello- hello? |
| ALLEN: | What up? |
| U/M: | Oh yea, um- Shorty was trying to call you earlier. He said, um- he wanted Bucky's number. |
| ALLEN: | [I/A] Bucky's number a thousand times man. Bucky got his phone off. |
| U/M: | Oh. Where you at yo? I'm at my grandmothers. |
| ALLEN: | I'm in the house. |
| U/M: | I'm trying call this number to my grandmothers. I'm gonna hit you right back in like ten minutes. I got the guy- i'm on the other phone, they got me on hold. This fucking crazy. |
| ALLEN: | [I/A] about 2-3 ounces of that [U/I]. |
| U/M: | Huh? |
| ALLEN: | Lemme get about 2-3 ounces of that Mock. That Cyrus. |
| U/M: | I can't hear you yo. |
| ALLEN: | I said, [U/I] bout 2-3 [U/I] of the Cyrus. |

U/M: Said carpet?

ALLEN: The Cyrus!

U/M: Chino, what you say?

ALLEN: I said lemme get about 2-3 of the Cyrus. The Miley Cyrus.

U/M: Oh, I ain't got none.

ALLEN: I got money to get em

U/M: Oh, yea?

ALLEN: Mmhmm.

U/M: I'm gonna come holla at you.- What up [U/I] family.- Yea, I'm gonna call you right back in like ten minutes.

17. I believe, based on my training, knowledge and expertise as well as my knowledge of this case, that ALLEN was asking the male for two to three ounces of suspected narcotics ("Lemme get about two to three ounces of that Mock. That Cyrus"). Based on experience, prior intercepted calls, and knowledge of this case, I believe that the DTO utilizes various celebrity names to refer to illegal substances in order to avoid detection from law enforcement, thus I believe that "Miley Cyrus" refers to narcotics.

18. On January 30, 2017, ALLEN using TARGET TELEPHONE 5 spoke to an unknown male. The following is an excerpt from that call.

ALLEN: That's what I was tryin' to figure out so I can go ahead and, uh, holler [PH] at the situation right away, so when you come, you'll be good.

U/M: Okay, okay okay. Shit. Well, I mean, you know, it's gonna be seven of us. It's gonna be—you know, it's gonna be seven of us, right?

ALLEN: Uh-huh.

U/M: You know, I mean, you know, on the--you know, seven, seven "babies".

ALLEN: Okay.

U/M: You know? Um, yeah. You know? I mean, I'm talkin' 'bout, I'm talkin' 'bout, you know, talkin' 'bout gettin' motherfuckin' dumbass girls, though, yo.

ALLEN: A'ight, yo. Straight [Voices overlap]

U/M: A'ight.

ALLEN: You know what I'm sayin', you want it straight?

U/M: Yeah, straight, straight. Yeah, straight like that.

ALLEN: Okay, pimping.

19. I believe, based on my training, knowledge and expertise, the context of the conversation as well as my knowledge of this case, that the male was ordering a quantity of narcotics ("You know, I mean, you know, on the--you know, seven, seven babies"). I further believe that the caller was ordering cocaine ("I'm talkin' 'bout, you know, talkin' 'bout gettin' motherfuckin' dumbass girls, though, yo" and "Yeah, straight, straight. Yeah, straight like that"). Based on my training, experience, and knowledge of this case, I know that the terms "girl" and "straight" are often utilized in the Baltimore area to refer to cocaine.

20. On January 30, 2017, ALLEN using TARGET TELEPHONE 5 spoke to "B". The following is an excerpt from that call (call # 3214):

| | |
|---|---|
| ALLEN: | [Addresses U/M in background] What's up, baby? You call me? You call me? |
| B: | Hello? |
| ALLEN: | [In the background] I got that good girl and that good raw dope [P/H]] What's up, baby? |
| B: | What's up? |

21. I believe, based on my training, knowledge and expertise, and context of the conversation that this call recorded ALLEN informing someone standing nearby (overheard in the the background of the call) that ALLEN had cocaine and heroin ("I got that good girl and that good raw dope [P/H]]"). Based on my training, experience and knowledge of this case, I know that the term "girl" is often utilized in the Baltimore area to refer to the illegal substance cocaine and the term "dope" is often utilized in the Baltimore area to refer to heroin.

22. On January 23, 2017, investigators intercepted calls between TROGDON and ALLEN in which the two made arrangements to travel to New York City. Based on the intercepted calls, investigators believed that ALLEN and TROGDON were planning to meet a source of supply of narcotics or cutting agents. Based on these calls, investigators established surveillance of the residences associated with ALLEN and TROGDON. Investigators saw ALLEN, TROGDON and an individual later identified as Tyron RICH exit TROGDON's suspected residence; enter TROGDON's truck and drive to New York City. The truck made multiple stops in New York City before returning, the same night, towards Baltimore City.

23. At approximately 8:40pm, the Maryland Transportation Authority Police (MdTA) with an ATF agent present, tracked the vehicle traveling 85 miles per hour in a posted 65 mile per hour zone. MdTA initiated a traffic stop and the truck was stopped near White Marsh, Maryland. Investigators could see that TROGDON was driving the vehicle, ALLEN was in the front passenger seat, and RICH was sitting in the back seat.

24. A K-9 scanned the vehicle and alerted to the presence of narcotics. During a subsequent search of the vehicle the MdTA team recovered: a box of wax bindles marked with a "Get Lucky" logo, and two containers disguised as WD-40 cans with false bottoms which contained four glassine baggies containing a white powder substance and four glassine baggies containing a brown powder substance. These substances were subsequently tested and found to be quinine and caffeine. I know, based on my training, knowledge and expertise, that quinine and caffeine are common cutting agents for heroin. I further know that wax bindles are commonly used to package narcotics, such as heroin. TROGDON, ALLEN, and RICH were subsequently released.

25. The next day, January 24, 2017, investigators intercepted a conversation between ALLEN and RICH. During the conversation, ALLEN and RICH discussed the police stopping them the night before. ALLEN told RICH, "Ain't no way in the world we supposed to include nobody on what we always do ourself." Based on my training, knowledge and expertise I believe that ALLEN was telling RICH they he and RICH should have gone to New York alone as they usually did. Later in the call ALLEN told an unidentified woman who joined the call, "I ain't got no charges or nothin' like that, so I'ma have to take the shit." When RICH rejoined the call, ALLEN said, "The bitch gonna go crazy on me and just [U/I] keep text to me every 5 minutes because I'm sayin', like, my niggas have more to lose than me. So I would have had to take the

charge." Based on my training, knowledge and expertise I believe ALLEN was explaining that if he and RICH and TROGDON were charged with a crime, he would have to take responsibility. Finally, ALLEN told RICH "My nigga, we come for one thing and I wanted to really see what the motherfucker was hittin'! I said to myself, Man, I'll just have to go up by myself and take care of everything from now and on, you know what I'm sayin'? On the train, a bus, it don't matter." Based on my experience and knowledge of the case, I believe that when ALLEN stated, "My nigga, we come for one thing and I wanted to really see what the motherfucker was hittin'" that ALLEN was explaining that they went to New York to get samples of the mixing agents to determine if they wanted to use the product to mix with their heroin and cocaine for distribution. Additionally, I believe that ALLEN told RICH that next time he was going to take the bus or train to New York by himself.

26. On February 13, 2017, investigators intercepted a call ALLEN and an individual believed to be Antonio ALLEN on TARGET TELEPHONE 5. Below is an expert from the conversation.

| | |
|---|---|
| ANTONIO: | Yeah, I go fill my prescription and--but I was tryin' to ge--I wanted to get with you. I've been thinkin' 'bout tryin' this shit, for real. I ain't- |
| ALLEN: | [U/I] [Stutters] They locked us up and took the shit! |
| ANTONIO: | When? |
| ALLEN: | Comin' from New York. |
| ANTONIO: | Hell no. |
| ALLEN: | I had a whole vic for you. They said this motherfuckin' hit [U/I] everythin', and, and, you know the nigga Buck a silly nigga. |

ANTONIO: Yeah, son did tell me that, for real, man.

ALLEN: Yeah, it was a, it was a mixaroni [PH], full of mixaroni.

ANTONIO: Dang.

ALLEN: I know where the spot at, though, so I'ma take you to it.

ANTONIO: A'ight, that's a bet.

ALLEN: [U/I]

ANTONIO: What you doin', for real?

ALLEN: A'ight. I'm in the house, so just come past.

ANTONIO: A'ight.

ALLEN: A'ight.

27. Based on my training, knowledge and expertise and knowledge of this case, I believe that in this call ANTONIO was asking ALLEN for some of the mixing agents ALLEN obtained in New York ("Yeah, I go fill my prescription and--but I was tryin' to ge--I wanted to get with you. I've been thinkin' 'bout tryin' this shit, for real."). ALLEN replied that he had been stopped on the way back from New York and the mixing agents seized ("[U/I] [Stutters] They locked us up and took the shit!"). ALLEN later told ANTONIO that he had seven grams of mixing agents for ANTONIO but that it had been seized by the police ("I had a whole vic for you. They said this motherfuckin' hit [U/I] everythin', and, and, you know the nigga Buck a silly nigga."). Based on my training, knowledge and expertise, I know that a "vic" is often used to refer to a seven-gram quantity of narcotics. Later in the call ALLEN stated, "Yeah, it was a, it was a mixaroni [PH], full of mixaroni." Based on my training, knowledge and expertise, I believe that

when ALLEN described the substance as a "mixaroni" he was indicating that the substance was a mixing agent for cocaine or heroin.

28. On February 9, 2017, ALLEN using TARGET TELEPHONE 5, spoke to Justin JOHNSON, believed to be another member of the DTO. The following is a transcript from that call:

ALLEN: Hello.

JOHNSON: Uncle

ALLEN: What's up, Butta?

JOHNSON: What's up? I'm trying to uh, buy two of them.

ALLEN: Huh?

JOHNSON: I'm trying to buy two of them.

ALLEN: Uh...What the [U/I] table? Two bottles [PH]?

JOHNSON: Nah. The uhm, boy. The... Rusky.

ALLEN: I'll holler at you in a few minutes.

JOHNSON: Down the Jets. Come over here. I'm [U/I] over here on Old York and Thirty-eighth.

ALLEN: I will call you when I get around the block.

JOHNSON: A'ight [U/I].

29. I believe, based on my training, knowledge and expertise as well as my knowledge of this case that in this call JOHNSON ordered a quantity ("two of them") of heroin ("boy") from

ALLEN. ALLEN agreed to the sale and arranged to meet JOHNSON ("Down the Jets"), which I believe to be the Latrobe Homes.

## THE TARGET ACCOUNTS

30. The Facebook account under the name "Terrell Allen" and account "terrell.allen.3382" belongs to ALLEN. ALLEN's Facebook account is closed to the public displaying three pictures, all of which are of Terrell ALLEN. ALLEN's account also has common friends with other DTO members' accounts.

31. Because the content of the **Target Account** will remain unless the user deletes such content, I submit that a search of these accounts will yield evidence of a crime inasmuch as those accounts will contain evidence from at or around the events summarized above.

32. To that end, the preservation request was sent to Facebook under case number 1100008 for ALLEN's account at "terrell.allen.3382". Based upon the aforementioned facts stated herein, I have probable cause to believe that further evidence of the SUBJECT OFFENSES are contained within the **Target Account**.

33. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

34. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

35. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

39. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

42. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

45. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

46. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

47. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

48. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

49. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

50. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

51. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's

state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

52. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

53. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

54. Based on the forgoing, I request that the Court issue the proposed search warrant.

55. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States … that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

56. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

17 - 1340 - ADC

Respectfully submitted,

Reid T. Messner
Special Agent
ATF

Subscribed and sworn to before me on May 2, 2017

The Honorable A. David Copperthite
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Facebook username TERRELL ALLEN (terrell.allen.3382) that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the username listed in Attachment A from the period of September 1, 2016 to February 21, 2017:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by that username and all photos and videos uploaded by any user that have that user tagged in them;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of (a) distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and (c) possession of a firearm during a crime of violence or drug trafficking crime, in violation of 18 U.S.C. § 924(c) involving ALLEN, BOONE and WEAVER including, for each username identified on Attachment A, information pertaining to the following matters:

(a) All photos and videos containing ALLEN

(b) All communications between ALLEN and other suspected DTO members and/or conspirators.

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e) The identity of the person(s) who created or used the username, including records that help reveal the whereabouts of such person(s).

(f) The identity of the person(s) who communicated with the username about matters relating to 21 U.S.C. § 841(a)(1); (b) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and (c) possession of a firearm during a crime of violence or drug trafficking crime, in violation of 18 U.S.C. § 924(c).

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, ________________________________, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is ____________________________. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of __________ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c. such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

____________________________ ____________________________________________

Date Signature